115 T.C. No. 36

UNITED STATES TAX COURT

INA F. KNIGHT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

HERBERT D. KNIGHT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 11955-98, 12032-98.[1]    Filed November 30, 2000.

On Dec. 28, 1994, Ps established a trust of which
P-H was trustee (the management trust), a family
limited partnership (the partnership) of which the
management trust was the general partner, and trusts
for the benefit of each of Ps' two adult children (the
children's trusts).  Ps transferred three parcels of
real property used by Ps and their children and some
financial assets to the partnership.  Each P
transferred a 22.3-percent interest in the partnership
to each of their children's trusts.

The parties stipulated that the steps to create
the partnership satisfied all requirements under Texas

---

[1]  These cases were consolidated for trial, briefing, and
opinion.

law, and that the partnership has been a limited partnership under Texas law since it was created.

Held:  We recognize the partnership for Federal gift tax purposes.

Held, further, the value of each of Ps' gifts to their children's trusts in 1994 was $394,515; i.e., 22.3 percent of the value of the real property and financial assets Ps transferred to the partnership, reduced by minority and lack of marketability discounts totaling 15 percent.

Held, further, sec. 2704(b), I.R.C., does not apply to this transaction.  See Kerr v. Commissioner, 113 T.C. 449 (1999).

William R. Cousins III, Robyn A. Frohlin, Todd Allen Kraft, Robert M. Bolton, Robert Don Collier, and John E. Banks, Jr., for petitioners.

Deborah H. Delgado, Gerald Brantley, and James G. MacDonald, for respondent.

COLVIN, Judge:  In separate notices of deficiency sent to each petitioner, respondent determined that each petitioner has a gift tax deficiency of $120,866 for 1994.

Petitioners formed a family limited partnership called the Herbert D. Knight Limited Partnership (the partnership), and gave interests in it to trusts they established for their children. After concessions, the issues for decision are:

1.  Whether, as respondent contends, the partnership is disregarded for Federal gift tax purposes.  We hold that it is not.

2. Whether, as petitioners contend, the fair market value of petitioners' gifts is the value of the assets in the partnership reduced by portfolio, minority interest, and lack of marketability discounts totaling 44 percent. We hold that discounts totaling 15 percent apply.

3. Whether the fair market value of each of petitioners' gifts to each children's trust on December 28, 1994, is $263,165 as petitioners contend, $450,086 as respondent contends, or some other amount. We hold that it is $394,515.

4. Whether section 2704(b) applies. We hold that it does not.

Unless otherwise indicated, section references are to the Internal Revenue Code. Rule references are to the Tax Court Rules of Practice and Procedure. References to petitioner are to Herbert D. Knight. References to Mrs. Knight are to petitioner Ina F. Knight.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

1. Petitioners' Family

Petitioners were married and lived in San Antonio, Texas, when they filed their petitions and at the time of trial. They have two adult children, Mary Faye Knight (Mary Knight) and Douglas Dale Knight (Douglas Knight). Petitioners' children were

not married, and petitioners had no grandchildren at the time of trial. Petitioner worked for Luby's Cafeterias for 49 years and retired at age 65 on December 31, 1992, as a senior vice president. In 1992, Douglas Knight was 40, and Mary Knight was 33. By December 1994, petitioners owned assets worth about $10 million, most of which was Luby's Cafeterias stock. Petitioners were both in excellent health at the time of trial.

2. Petitioners' Real Property

In 1861, petitioner's great-grandfather bought a 290-acre ranch (the ranch) in Freestone County, Texas, about 120 acres of which is pasture. Knight family members are buried in a cemetery on the ranch. Petitioner was raised on the ranch. By 1959, parts of the ranch were owned by several members of petitioner's family. In 1959, petitioner began to buy parts of the ranch for sentimental reasons. Petitioner generally has 55 to 75 cattle on the ranch. The ranch has never been profitable while petitioner owned it.

Petitioners bought their family residence at 6219 Dilbeck in Dallas, Texas, on June 1, 1973. Petitioners moved to San Antonio in 1981. Douglas Knight lived at 6219 Dilbeck rent-free from 1984 to the date of trial. Petitioners bought a residence at 14827 Chancey in Addison, Texas, on May 12, 1993. Mary Knight has lived there rent-free from 1993 to the date of trial except from November 1995 to September 1997.

Petitioner managed the ranch and the houses before December 28, 1994. Petitioner paid the real estate taxes and insurance on those properties before December 28, 1994.

B. The Partnership

1. Initial Discussions

Robert Gilliam (Gilliam), a certified public accountant, met petitioner in the 1970's while Gilliam was auditing Luby's Cafeterias. Petitioners became Gilliam's tax clients in 1992 or 1993. Gilliam and petitioner discussed estate planning in 1993 and 1994.

Gilliam knew that petitioners had about $10 million in assets. Gilliam and petitioner discussed the fact that, if petitioners did no estate planning, Federal transfer taxes would equal 50 to 55 percent of their estate. Gilliam and petitioner discussed the tax benefits of estate planning. Gilliam told petitioners that they could claim discounts for transferred limited partnership interests if supported by a professional appraisal. Gilliam believed that petitioners could form a trust to help protect their assets from creditors and that a limited partnership would add another layer of protection for those assets.

Petitioner sought estate planning advice from John Banks, Jr. (Banks), in 1993 or 1994. Banks had been petitioners' attorney since 1981. Petitioners met with Gilliam or Banks

several times in November and December 1994.  Late in 1994, Gilliam and Banks devised and helped to implement an estate plan for petitioners using a family limited partnership and related trusts.

### 2.   Implementing the Plan

On December 6, 1994, petitioner opened an investment account at Broadway National Bank in the name of petitioners' family limited partnership, the Herbert D. Knight limited partnership (created on December 28, 1994, as described below), and transferred Treasury notes to it.  On December 12, 1994, petitioners opened a checking account for their partnership at Broadway National Bank and transferred $10,000 to it from their personal account.  On December 15, 1994, petitioners transferred $558,939.43 worth of a USAA municipal bond fund from their personal investment account to the partnership.

On December 28, 1994, the following occurred:

a.   Petitioners signed documents which created the partnership, consisting of 100 units of ownership.  The steps followed in the creation of the partnership satisfied all requirements under Texas law to create a limited partnership.

b.   Petitioners conveyed the ranch and the real property at 6219 Dilbeck and 14827 Chancey to the partnership.

c.   Petitioners created the Knight Management Trust (management trust).  The steps followed in the creation of the

management trust satisfied all requirements under Texas law to create a trust. The management trust was the partnership's general partner.

d.  Petitioners each transferred a one-half unit of the partnership to the management trust. That unit is the only asset held by the management trust. Petitioners each owned a 49.5-percent interest in the partnership as limited partners.

e.  Petitioners created trusts for Mary Knight and Douglas Knight (the children's trusts). The documents petitioners executed were sufficient under Texas law to create the children's trusts. Douglas Knight and Mary Knight were each the beneficiary and trustee of the children's trust bearing their name.

f.  Petitioners each signed codicils to their wills in which they changed the bequests to their children to bequests to the children's trusts.

g.  Petitioners each transferred a 22.3-percent interest in the partnership to each of the children's trusts. After those transfers, petitioners each retained a 4.9-percent interest in the partnership as limited partners.

3.  <u>The Partnership Agreement</u>

The partnership has been a limited partnership under Texas law since it was created. Article 9 of the partnership agreement prohibits any partner from withdrawing from the partnership or demanding the return of any of his or her capital contribution or

the balance in that partner's capital account.  Article 14
provides that the partnership will continue for 50 years, unless
all partners consent to a dissolution.  Under the partnership
agreement, petitioner, as trustee of the management trust, could
sell any asset or part of any asset at any time.

The fair market values (before any discounts) of partnership
assets on December 28, 1994, were as follows:

| | |
|---|---:|
| Freestone County Ranch (with mineral rights) | $182,251 |
| Residential property (6219 Dilbeck) | 166,880 |
| Residential property (14827 Chancey) | 145,070 |
| USAA municipal bond fund | 553,653 |
| Dreyfus municipal bond fund | 510,239 |
| Treasury notes | 461,345 |
| Insurance policies | 51,885 |
| Cash | 10,000 |
| Total | 2,081,323 |

Petitioners transferred the bond funds and Treasury notes to
brokerage accounts in the name of the partnership.  The
partnership had no liabilities and no assets other than those
listed above.  All of these assets were petitioners' community
property before being transferred to the partnership.

C.   Operation of the Management Trust and Partnership

1.   Operation of the Management Trust

Petitioner has been the only trustee of the management
trust.  Petitioner decides which assets to buy and sell, pays all
partnership expenses, handles and keeps records of all
partnership transactions, and explains the transactions to the
partnership's accountants.  The management trust has never had a

checking account. The partnership paid the management trust expenses, such as preparation of the trust tax returns.

2. Operation of the Partnership

Petitioner signed all of the checks drawn on the partnership checking account. The partnership kept no records, prepared no annual reports, and had no employees. The children and their trusts did not participate in managing the partnership. The partners or their representatives have not exchanged any correspondence, meeting notes, or e-mail about the partnership's operations. The partners never met and never discussed conducting any business activity. All assets and know-how came from petitioners.

The partnership has never borrowed or lent money, and never conducted any business activity. It has not bought, otherwise acquired, or sold any notes or obligations of any entity other than Government-backed securities. The partnership did not prepare annual financial statements or reports.

3. Partnership Assets

Petitioner did not trade the partnership's bond funds. He reinvested the partnership's Treasury notes when they matured. He managed these investments the same way before and after he transferred them to the trust. The partnership did not rent real property to third parties.

A substantial portion of the partnership assets (the two houses and the ranch) was used for personal purposes before and after petitioners formed the partnership. Petitioners' children did not sign a lease or pay rent to the partnership in exchange for living at 6219 Dilbeck and 14827 Chancey. Petitioners' children paid the utilities while they lived at 6219 Dilbeck and 14827 Chancey. The partnership paid the utilities at 14827 Chancey while Mary Knight was absent from November 1995 to September 1997. Petitioners paid real property taxes for 1994 for the ranch, 6219 Dilbeck, and 14827 Chancey, and the partnership paid them thereafter. Petitioners paid property insurance premiums for 1994 for 6219 Dilbeck and 14827 Chancey, and the partnership paid them thereafter. The expenses of 6219 Dilbeck and 14827 Chancey were more than 70 percent of the partnership's annual expenses.

Petitioner continued to operate the ranch after he contributed it to the partnership. He paid no rent to the partnership until December 1998, after the petitions in these cases were filed. The parties stipulated that, in December 1998, petitioner entered into an oral pasture lease on the ranch between himself as an individual and himself as trustee. On December 31, 1998, petitioner paid $1,500 to the partnership as rent under the oral pasture lease.

D.    Federal Tax Returns

Petitioners filed Federal gift and generation-skipping transfer tax returns for 1994.  Both petitioners reported that they had given a 22.3-percent interest in the partnership to each of the children's trusts.

The partnership filed Forms 1065, U.S. Partnership Return of Income, for 1995, 1996, and 1997.  The management trust and each of the children's trusts filed Forms 1041, U.S. Income Tax Return for Estates and Trusts, for 1995, 1996, and 1997.

OPINION

A.    Contentions of the Parties

The parties agree that the starting point for valuing petitioners' gifts to their children's trusts is the fair market value of the assets petitioners transferred to the partnership (i.e., $2,081,323), but they disagree about which discounts apply.

Respondent contends that petitioners' family limited partnership should be disregarded for gift tax valuation purposes.  Thus, respondent contends that the fair market value of each of the gifts is $450,086; i.e., 22.3 percent of the fair market value of the real property and financial assets given by petitioners, discounted for selling expenses and built-in capital gains.

Petitioners contend that the partnership must be recognized for Federal gift tax purposes,[2] and that portfolio, minority, and lack of marketability discounts totaling 44 percent apply, reducing the value of each of the gifts to $263,165. Alternatively, petitioners contend that, if we do not recognize the partnership for Federal gift tax purposes, the value of each of the four gifts is between $429,781 and $435,291 after application of fractional interest and transactional costs discounts.

B.    Whether To Disregard the Partnership for Gift Tax Purposes

Respondent contends that the partnership lacks economic substance and fails to qualify as a partnership under Federal law.  See, e.g., Commissioner v. Culbertson, 337 U.S. 733, 740 (1949); Commissioner v. Tower, 327 U.S. 280, 286 (1946); Merryman v. Commissioner, 873 F.2d 879, 882-883 (5th Cir. 1989), affg. T.C. Memo. 1988-72.[3]  Petitioners contend that their rights and legal relationships and those of their children changed significantly when petitioners formed the partnership,

---

[2]  Petitioners contend that respondent bears the burden of proving that the partnership should be disregarded for lack of economic substance.  We need not decide petitioners' contention because our findings and analysis on that issue do not depend on which party bears the burden of proof.

[3]  Respondent does not contend that we should apply an indirect gift analysis.  See Kincaid v. United States, 682 F.2d 1220 (5th Cir. 1982); Shepherd v. Commissioner, 115 T.C. ____ (2000); sec. 25.2511-1(h)(1), Gift Tax Regs.  Thus, we do not consider that analysis here.

transferred assets to it, and transferred interests in the partnership to their children's trusts, and that we must recognize the partnership for Federal gift tax valuation purposes. We agree with petitioners.

State law determines the nature of property rights, and Federal law determines the appropriate tax treatment of those rights. See United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985); United States v. Rodgers, 461 U.S. 677, 683 (1983); Aquilino v. United States, 363 U.S. 509, 513 (1960). The parties stipulated that the steps followed in the creation of the partnership satisfied all requirements under Texas law, and that the partnership has been a limited partnership under Texas law since it was created. Thus, the transferred interests are interests in a partnership under Texas law. Petitioners have burdened the partnership with restrictions that apparently are valid and enforceable under Texas law. The amount of tax for Federal estate and gift tax purposes is based on the fair market value of the property transferred. See secs. 2502, 2503. The fair market value of property is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." See sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. We apply the willing buyer, willing seller test to value the

interests in the partnership that petitioners transferred under Texas law.  We do not disregard the partnership because we have no reason to conclude from this record that a hypothetical buyer or seller would disregard it.

Respondent relies on several income tax economic substance cases.  See, e.g., Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978); Knetsch v. United States, 364 U.S. 361, 366 (1960); ASA Investerings Partnership v. Commissioner, 201 F.3d 505, 511-516 (D.C. Cir. 2000), affg. T.C. Memo. 1998-305; ACM Partnership v. Commissioner, 157 F.3d 231, 248 (3d Cir. 1998), affg. in part and revg. in part T.C. Memo. 1997-115; Merryman v. Commissioner, supra; Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 278 (1999).  We disagree that those cases require that we disregard the partnership here because the issue here is what is the value of the gift.  See secs. 2501, 2503; sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs.

Respondent points out that in several transfer tax cases we and other courts have valued a transfer based on its substance instead of its form.  See, e.g., Heyen v. United States, 945 F.2d 359, 363 (10th Cir. 1991); Schultz v. United States, 493 F.2d 1225 (4th Cir. 1974); Estate of Murphy v. Commissioner, T.C. Memo. 1990-472; Griffin v. United States, 42 F. Supp. 2d 700, 704 (W.D. Tex. 1998).  Our holding is in accord with those cases because we believe the form of the transaction here (the creation

of the partnership) would be taken into account by a willing

buyer; thus the substance and form of the transaction are not at

odds for gift tax valuation purposes.  Respondent agrees that

petitioners created and operated a partnership as required under

Texas law and gave interests in that partnership to their

children's trusts.  Those rights are apparently enforceable under

Texas law.

C.   Whether the Value of Petitioners' Four Gifts Is Limited to
     $300,000 Each

The transfer document through which petitioners made the

gifts at issue states that each petitioner transferred to each of

their children's trusts the number of limited partnership units

which equals $300,000 in value.[4]  Petitioners contend that this

bars respondent from asserting that the value of each partnership

interest exceeds $300,000.

Respondent contends that the transfer document makes a

formula gift that is void as against public policy.  Respondent

relies on Commissioner v. Procter, 142 F.2d 824 (4th Cir. 1944),

and Ward v. Commissioner, 87 T.C. 78, 109-116 (1986).  In

Procter, the transfer document provided that, if a court decided

---

[4]  The transfer document identifies petitioners as
transferors and states:

> Transferor irrevocably transfers and assigns to each
> Transferee above identified, as a gift, that number of
> limited partnership units in Herbert D. Knight Limited
> Partnership which is equal in value, on the effective
> date of this transfer, to $600,000.

a value that would cause a part of the transfer to be taxable, that part of the transfer would revert to the donor. The U.S. Court of Appeals for the Fourth Circuit described this provision as a condition subsequent, and held that it was void as against public policy. See Commissioner v. Procter, supra at 827.

We need not decide whether Procter and Ward control here because we disregard the stated $300,000 gift value for other reasons. First, petitioners reported on their gift tax returns that they each gave two 22.3-percent interests in the partnership. Contrary to the transfer document, they did not report that they had given partnership interests worth $300,000. We believe this shows their disregard for the transfer document, and that they intended to give 22.3-percent interests in the partnership.[5]

Second, even though petitioners contend that respondent is limited to the $300,000 amount, i.e., that the gifts were for $300,000 and thus cannot be worth more than $300,000, petitioners contend that the gifts are each worth less than $300,000. In fact, petitioners offered expert testimony to show that each gift was worth only $263,165. We find petitioners' contentions to be at best inconsistent. We treat petitioners' contention and offer

---

[5] Gifts of 22.3-percent partnership interests are at odds with the appraisal which valued a 22.22222-percent interest at the $300,000 amount specified in the transfer document. Petitioners do not explain this discrepancy between the transfer document and their returns.

of evidence that the gifts were worth less than $300,000 as opening the door to our consideration of respondent's argument that the gifts were worth more than $300,000.

D.  <u>Petitioners' Contention That a Portfolio Discount and Minority and Lack of Marketability Discounts Totaling 44 Percent Apply</u>

Petitioners' expert, Robert K. Conklin (Conklin), estimated that, if we recognize the partnership for Federal tax purposes, a 10-percent portfolio discount and discounts of 10 percent for minority interest and 30 percent for lack of marketability apply, for an aggregate discount of 44 percent.[6]

1.  <u>Portfolio Discount</u>

Conklin concluded that a 10-percent portfolio discount applies based on the assumption that it is unlikely that a buyer could be found who would want to buy all of the Knight family partnership's assets.  He provided no evidence to support that assumption, see Rule 143(f)(1); <u>Rose v. Commissioner</u>, 88 T.C. 386, 401 (1987), affd. 868 F.2d 851 (6th Cir. 1989); <u>Compaq Computer Corp. v. Commissioner</u>, T.C. Memo. 1999-220.

To estimate the amount of the portfolio discount, Conklin relied on a report stating that conglomerate public companies tend to sell at a discount of about 10 to 15 percent from their

---

[6] Respondent's expert, Francis X. Burns, testified about the "fair value" but not the "fair market value" of the partnership interests at issue in these cases.  We have not considered his testimony in deciding the fair market value of the gifts.

breakup value. However, the Knight family partnership is not a conglomerate public company.

Conklin cites Shannon Pratt's definition of a portfolio discount[7] in estimating the portfolio discount to apply to the assets of the partnership. A portfolio discount applies to a company that owns two or more operations or assets, the combination of which would not be particularly attractive to a buyer. See Estate of Piper v. Commissioner, 72 T.C. 1062, 1082 (1979). The partnership held real estate and marketable securities. Conklin gave no convincing reason why the partnership's mix of assets would be unattractive to a buyer. We apply no portfolio discount to the assets of the partnership.

2.    Lack of Control and Marketability Discounts

Conklin concluded that a lack of control discount applies. He speculated that, because the partnership invested a large part

---

[7] Pratt et al., Valuing a Business, The Analysis and Appraisal of Closely Held Companies 325 (3d ed. 1996):

The concept of a 'portfolio' discount is a discount for a company that owns anywhere from two to several dissimilar operations and/or assets that do not necessarily fit well together. Many private companies have accumulated such a package of disparate operations and/or assets over the years, the combination of which probably would not be particularly attractive to a buyer seeking a position in any one of the industries, necessitating a discount to sell the entire company as a package. Research indicates that conglomerate public companies tend to sell at a discount of about 10 to 15 percent from their breakup value, although the relationship is not consistent from company to company or necessarily over time.

of its assets in bonds, and investors in the bond fund could not influence investment policy, the partnership "could be similar to a closed-end bond fund".[8] He estimated that a lack of control discount of 10 percent applies by evaluating the difference between the trading value and the net asset values on October 21, 1994, of 10 publicly traded closed-end bond funds. The 10 funds that Conklin chose are not comparable to the Knight family partnership.[9] We find unconvincing his use of data from noncomparable entities to increase the discount. However, on

---

[8] A publicly traded closed-end bond fund owns a fixed number of bonds. The net asset value of those bonds held by a closed-end fund is published. The value of an interest in a closed-end fund may trade at a premium (i.e., above the net asset value per share) or at a discount (i.e., below the net asset value per share).

[9] Only the Nuveen Municipal Value Fund had assets that were comparable to the partnership. No hard and fast rule dictates the number of comparables required, but courts have rejected use of one comparable, see Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Estate of Rodgers v. Commissioner, T.C. Memo. 1999-129; Klukwan, Inc. v. Commissioner, T.C. Memo. 1994-402; Crowley v. Commissioner, T.C. Memo. 1990-636, affd. on other grounds 962 F.2d 1077 (1st Cir. 1992); Higgins v. Commissioner, T.C. Memo. 1990-103; Dennis v. United States, 70 AFTR 2d 92-5946, 92-5949, 92-2 USTC par. 50,498 (E.D. Va. 1992), unless it is compelling, see also 885 Inv. Co. v. Commissioner, 95 T.C. 156, 167-168 (1990); Estate of Fawcett v. Commissioner, 64 T.C. 889, 899-900 (1975); Clark v. Commissioner, T.C. Memo. 1978-402. The comparability is not compelling here. First, the value of the partnership's interest in the two bond funds was about $1.1 million; the value of the assets in the Nuveen Municipal Value Fund was nearly $1.9 billion. Second, 51 percent of the partnership assets were invested in two tax-exempt municipal bond funds; the Nuveen Municipal Value Fund held no real property.

this record, we believe some discount is appropriate based on an analogy to a closed-end fund.

Conklin cited seven studies of sales of restricted stocks from 1969 to 1984 to support his estimate that a 30-percent discount for lack of marketability applies. He used a table summarizing initial public offerings of common stock from 1985 to 1993. However, he did not show that the companies in the studies or the table were comparable to the partnership, or explain how he used this data to estimate the discount for lack of marketability. See <u>Tripp v. Commissioner</u>, 337 F.2d 432, 434-435 (7th Cir. 1964), affg. T.C. Memo. 1963-244; <u>Rose v. Commissioner</u>, <u>supra</u>; <u>Chiu v. Commissioner</u>, 84 T.C. 722, 734-735 (1985). He also listed seven reasons why a discount for lack of marketability applies, but he did not explain how those reasons affect the amount of the discount for lack of marketability.

### 3. Conklin's Factual Assumptions

Conklin listed 19 purported business reasons for which he said the partnership was formed. Petitioners claimed to have had only 5 of those 19 reasons.[10] Conklin also said: "The

---

[10] Petitioners' five reasons are: (a) Centralize control of family investments; (b) avoid fragmentation of interests; (c) consolidate family interests into one entity; and protect the children's assets (d) from creditors and (e) in the event of a divorce.

The 14 reasons Conklin gave but petitioners did not are: (a) Obtain better rates of return; (b) reduce administrative costs; (c) provide for competent management in case of death or

(continued...)

compensation and reimbursement paid to the general partner reduce the income available to limited partners or assignees." His statement is inapplicable because the general partner received no compensation and incurred no expenses.

We have rejected expert opinion based on conclusions which are unexplained or contrary to the evidence. See Rose v. Commissioner, supra; Compaq Computer Corp. v. Commissioner, supra. An expert fails to assist the trier of fact if he or she assumes the position of advocate. See Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990); Laureys v. Commissioner, 92 T.C. 101, 122-129 (1989). Conklin's erroneous factual assumptions cast doubt on his objectivity.

4.  Conclusion

The parties stipulated that the net asset value of the partnership was $2,081,323 on December 28, 1994. Each petitioner gave each trust a 22.3-percent interest in the partnership; 44.6 percent of $2,081,323 is $928,270.

---

[10](...continued)
disability; (d) avoid cumbersome and expensive guardianships; (e) avoid or minimize probate delay and expenses; (f) minimize franchise tax liability; (g) provide business flexibility because the agreement can be amended; (h) eliminate ancillary probate proceedings; (i) provide a convenient mechanism for making annual gifts; (j) provide a vehicle to educate descendants about family assets to increase their value; (k) provide a mechanism to resolve family disputes; (l) avoid adverse tax consequences that may occur by dissolving a corporation; (m) provide better income tax treatment than would apply to a corporation or trust; and (n) provide more flexibility in making investments than a trust because of the fiduciary standard.

We conclude that Conklin was acting as an advocate and that his testimony was not objective.  However, despite the flaws in petitioners' expert's testimony, we believe that some discount is proper, in part to take into account material in the record relating to closed-end bond funds.  We hold that the fair market value of an interest in the Knight family partnership is the pro rata net asset value of the partnership less a discount totaling 15 percent for minority interest and lack of marketability.  Thus, on December 28, 1994, each petitioner made taxable gifts of $789,030 (44.6 percent of $2,081,323, reduced by 15 percent).

E.    Whether Section 2704(b) Applies

Respondent contends that Article 14 (the 50-year term or dissolution by agreement of all partners) and Article 9 (the lack of withdrawal rights for limited partners) of the partnership agreement are applicable restrictions under section 2704(b) because sections 8.01 and 6.03 of Texas Revised Limited Partnership Act (TRLPA), Tex. Rev. Civ. Stat. Ann. art. 6132a-1 (West Supp. 1993), are less restrictive.  We disagree.  See Kerr v. Commissioner, 113 T.C. 449 (1999).

If a transferor conveys to a family member an interest in a partnership or a corporation which is subject to an "applicable restriction", and the transferor and transferor's family members control the entity immediately before the transfer, the restriction in valuing the interest shall be disregarded.  See

sec. 2704(b)(1).  An "applicable restriction" is a provision that limits the ability of the partnership or corporation to liquidate if (1) the restriction lapses after the transfer, or (2) the transferor or any member of the transferor's family, collectively or alone, can remove or reduce the restriction after the transfer.  See sec. 2704(b)(2); sec. 25.2704-2(b), Gift Tax Regs. However, a restriction on liquidation is not an applicable restriction if it is not more restrictive than limitations on liquidation under Federal or State law.  See sec. 2704(b)(3).

In Kerr, the Commissioner contended that the provisions in the partnership agreement (50-year term or dissolution by agreement of all partners and the lack of withdrawal rights for limited partners) were applicable restrictions under section 2704(b) because TRLPA sections 8.01 and 6.03 were less restrictive.  We rejected those arguments in Kerr and noted that, under Texas law, a limited partner may withdraw from a partnership without requiring the dissolution and liquidation of the partnership.  See id. at 473.  We concluded that the partnership agreements in Kerr were not more restrictive than the limitations that generally would apply to the partnerships under Texas law.  See id. at 472-474.  Similarly, we conclude that section 2704(b) does not apply here.

To reflect the foregoing,

Decisions will be entered
under Rule 155.

Reviewed by the Court.

CHABOT, COHEN, PARR, RUWE, WHALEN, HALPERN, CHIECHI, GALE, and THORNTON, JJ., agree with this majority opinion.

LARO and MARVEL, JJ., concur in result only.

FOLEY, J., concurring in result: Family limited partnerships are proliferating as an estate planning device, taxpayers are planning amid great uncertainty, and respondent is asserting numerous theories (i.e., economic substance, Chapter 14, section 2036, immediate gift upon formation, etc.) in an attempt to address these transactions. It is important that we clarify the law in this area with a careful statement of the applicable principles. While I agree with the majority that the partnership must be respected, I write separately to emphasize two points.

I.   The "Willing Buyer, Willing Seller" Test Is Not a Relevant Consideration in Determining Whether a Partnership Is To Be Respected Under State Law

I disagree with some of the reasoning set forth in the majority opinion. Specifically, the rationale set forth for respecting the partnership is as follows:

> We do not disregard the partnership because we have no reason to conclude from this record that a hypothetical buyer or seller would disregard it.
>
>         *    *    *    *    *    *    *
>
> * * * we believe the form of the transaction here (the creation of the partnership) would be taken into account by a willing buyer; thus the substance and form of the transaction are not at odds for gift tax valuation purposes. * * * [Majority op. pp. 14-15.]

The Knight family limited partnership is a valid legal entity under Texas law. Even if a hypothetical buyer and seller were to determine that the value of the partnership interest was

equal, or approximately equal, to the value of the corresponding underlying assets,[1] that would not be legal justification for applying the economic substance doctrine and disregarding the partnership. Whether "the form of the transaction here (the creation of the partnership) would be taken into account by a willing buyer" is not a relevant consideration in determining whether the entity must be respected for transfer tax purposes. Our assessment of the property rights transferred is a State law determination not affected by the "willing buyer, willing seller" valuation analysis. Sec. 20.2031-1(b), Estate Tax Regs. (stating that the fair market value of property is "the price at which the property would change hands between a willing buyer and a willing seller"). In essence, that analysis assists the Court in determining the value of partnership interest <u>after</u> the Court establishes whether the entity is recognized under State law.

The determination of whether or not the partnership should be respected is independent of the value of the partnership interest. The logical inference from the majority's statements, however, is that a partnership could be disregarded for lack of economic substance if a hypothetical willing buyer would not respect the partnership form. This language may mislead

---

[1] The value of the partnership interest and its corresponding underlying assets will not be equal because virtually any binding legal restriction will make such partnership interest less than the value of its corresponding underlying assets.

respondent and encourage him to proffer expert testimony in a fruitless attempt to establish that a partnership should be disregarded because the value of a partnership interest is equal, or approximately equal, to the value of the corresponding underlying assets.  The "willing buyer, willing seller" analysis merely establishes the value of a partnership interest, not whether the economic substance doctrine is applicable.

II.  The Economic Substance Doctrine Should Not Be Employed in the Transfer Tax Regime To Disregard Entities

A fundamental premise of transfer taxation is that State law defines and Federal tax law then determines the tax treatment of property rights and interests.  See Drye v. United States, 528 U.S. 49 (1999); Morgan v. Commissioner, 309 U.S. 78 (1940).  As a result, the courts have not employed the economic substance doctrine to disregard an entity (i.e., one recognized as bona fide under State law) for the purpose of disallowing a purported valuation discount.

The application of the economic substance doctrine in the transfer tax context generally has been limited to cases where a taxpayer attempts to disguise the transferor or transferees.  The courts in these cases occasionally mention, but do not explicitly incorporate, a business purpose inquiry in their analysis.  See Heyen v. United States, 945 F.2d 359 (10th Cir. 1991)(applying only substance over form analysis to a gift of stock to disregard

intermediate transferees); <u>Schultz v. United States</u>, 493 F.2d 1225 (4th Cir. 1974)(applying essentially a substance over form analysis to reciprocal gifts); <u>Griffin v. United States</u>, 42 F. Supp. 2d 700 (W.D. Tex. 1998)(discussing the lack of business purpose inherent in gifts, and then applying economic substance analysis to a gift of stock).

Generally, the economic substance doctrine, with its emphasis on business purpose, is not a good fit in a tax regime dealing with typically donative transfers.  Business purpose will oftentimes be suspect in these transactions because estate planning usually focuses on tax minimization and involves the transfer of assets to family members.  If taxpayers, however, are willing to burden their property with binding legal restrictions that, in fact, reduce the value of such property, we cannot disregard such restrictions.  To do so would be to disregard economic reality.

WELLS, <u>C.J</u>., agrees with this concurring opinion.

BEGHE, <u>J</u>., dissenting:  Using the estate depletion approach set forth in my dissenting opinion in <u>Shepherd v. Commissioner</u>, 115 T.C. ___ (2000) (slip opinion pp. 63-67), as supplemented by my dissenting opinion in <u>Estate of Strangi v. Commissioner</u>, 115 T.C. ___ (2000) (slip opinion pp. 39-48),  I respectfully suggest that the valuation focus in this case should have been on the assets transferred by the donors, rather than on the partnership interests received by the donees.  I would have valued the gifts at 100 percent of the values of the assets transferred to the partnership by Mr. and Mrs. Knight, reducing the values so arrived at by the values of the partnership interests Mr. and Mrs. Knight received and retained.