T.C. Memo. 2008-64

UNITED STATES TAX COURT

RAYMOND L. MONK, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10964-03, 6132-04.   Filed March 17, 2008.

<u>Caroline D. Ciraolo</u>, for petitioner.

<u>Bradley C. Plovan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  For many years, Raymond Monk reported his
interest in a Baltimore bar called Chuck's Place as a sole
proprietorship on his tax returns.  This wasn't surprising--it
was his name on the bar's liquor license, his name on the bar's
checking account, and it was he who was recognized by Maryland as
the bar's lottery agent.  But when the Commissioner began an
audit, Monk's accountant delved deeper and determined that Monk

should have been reporting his income from the bar as nothing more than rent. "Taxation * * * is eternally lively; it concerns nine-tenths of us more directly than either smallpox or golf, and has just as much drama in it; moreover, it has been mellowed and made gay by as many gaudy, preposterous theories."[1]

We must decide, in this lively controversy, whether Monk was merely a landlord or whether, as the Commissioner implies, this is just another gaudy, preposterous theory.

FINDINGS OF FACT

Raymond Monk has dabbled over the years in a variety of businesses, including drywall installation, plumbing, running a delicatessen, and even raising rabbits. He's also invested in more than a half dozen pieces of commercial real estate in and around Baltimore. In all but one of these rental arrangements, Monk declined to draft written leases, relying instead on "you pay, you stay" oral agreements.[2]

Charles (Chuck) Maney met Monk more than twenty years ago when Monk was dating his sister. Their friendship grew and Maney went to work for Monk in both his plumbing and drywall businesses. When Monk decided to retire from construction, Maney

---

[1] H.L. Mencken, "The Dismal Science," Smart Set, June 1922, at 42.

[2] Monk has only one written lease in his entire portfolio-- with a tenant who demanded formal documentation to maintain a liquor license.

decided to retire as well.  But unlike Monk, who was leaving the city life to move to the bucolic mountains of western Maryland, Maney--who had worked in a saloon before meeting his friend--wanted to stay in Baltimore and run a bar.  He faced just two obstacles:  He didn't have the money or knowhow to buy a building for the bar, and in his distant youth he'd committed a felony which, as far as he knew, would keep him from getting a liquor license.  Maney talked to Monk; Monk said that since Maney liked the bar business and Monk liked rental property, Monk would help Maney out.

In 1994, Monk and Maney went in together to buy a bar and building in the blue-collar Baltimore neighborhood of Highlandtown.  Maney gave Monk $40,000 to cover the cost of the business--which he named Chuck's Place--and Monk put up the remainder of the $210,000 purchase price.  Monk then applied for and received the liquor license for Chuck's Place and became the bar's registered sales agent for the Maryland Lottery.  He also set up a bank account for Chuck's Place and gave Maney full signatory authority over it.  With that done, Monk moved almost 200 miles away and left the operation of the bar to Maney.

In the mid-1990s, Highlandtown was a rough neighborhood. Chuck's Place was open every day from 6 a.m. to 2 a.m., so Maney and his family (who helped him run the bar) moved into the second floor of the building to keep an eye on things.  He installed

security cameras so that he could watch the bar from the apartment and set up separate phone lines for the bar and residence so that he could be reached at any time with questions or problems. As the years passed, though, about the only problem Maney really had was the occasional bounced check. That wasn't enough of a problem, however, to deter him from offering to cash both payroll and personal checks for his regular customers. Since many of them didn't even have bank accounts, cashing their checks inclined them to spend more money at the bar. (On this point we found Maney particularly credible.) In any event, the increased business offset the risks of check cashing. Out of convenience more than anything else, Maney would keep any extra change from the check (i.e., if the check was for $510.53, he'd give the customer $510 and keep 53 cents) and set it aside along with other change collected to help pay for an annual children's Christmas party.

Per his oral agreement with Monk, Maney paid for all interior expenditures himself and deducted the cost of any exterior repairs and maintenance from the $2,500 monthly rent that he paid Monk.[3] Maney's sister originally kept the books for Chuck's Place, but Maney's wife took over when his sister started getting--as Maney put it--"sticky fingers with the revenue." At

---

[3] Maney referred to this cost allocation as the "swinging door" agreement: if the door swung in, Maney was responsible; if the door swung out, Monk was on the hook.

the end of each year, Maney would send a "Dome Book"[4] to Monk for him to figure out since the whole thing was, according to Maney, far too complicated for him to untangle himself.

Monk used Joseph Hahn, a certified public accountant, to prepare his income tax returns for nearly twenty years. Hahn would send Monk an organizer with the previous year's tax return figures, and Monk would update the organizer and return it along with all of his annual financial records. After Hahn prepared and reviewed the return, he sent it to Monk to sign and file. Because Monk always included Chuck's Place's Dome Book in the papers forwarded along with the organizer, Hahn assumed Monk owned Chuck's Place and thus reported it as Schedule C income.

From 1994, then, Monk was reporting income and losses from Chuck's Place on a Schedule C attached to his income tax return. But then the Commissioner audited Monk's 1999 and 2000 returns, which showed net operating losses. Part of these losses was attributable to Chuck's Place, part to Monk's rental properties, and part to his other business activities. As the audit progressed, Hahn realized that Monk wasn't directly involved in the management of Chuck's Place. He and Monk then prepared

---

[4] "Dome Book" was the witnesses' shorthand way of referring to a recordkeeping notebook published by the Dome Publishing Company and widely used by small businesses to organize their receipts and expenses.

amended income tax returns for 2000,[5] 2001, and 2002, deleting the income and expenses of Chuck's Place from his schedule C and including them (to the extent that they were landlord expenses) on his schedule E. Monk's 2003 tax return listed the rent from Chuck's Place on Schedule E when originally filed.[6]

The Commissioner rejected the change in characterization and determined that Chuck's Place was underreporting income from what she was convinced was a check-cashing business. She used two different indirect analytic methods to quantify the resulting deficiencies. One was the well-known modified-bank-deposits method. See Fry v. Commissioner, T.C. Memo. 1991-51, affd., without published opinion, 8 F.3d 26 (9th Cir. 1993). The other --the check-cashing-fee method--was custom designed by the revenue agent for this case and tried to determine unreported check-cashing income by figuring out the cash on hand at the bar. For the years in this case--1999 and 2000--the agent calculated the deficiency using both methods and went with the one that generated the highest tax due. This led her to use the modified-bank-deposits method for 1999, but to use the check-cashing-fee method for 2000.

---

[5] The amended 2000 tax return was filed with the IRS as part of the audit.

[6] Monk hadn't reported the rent he received from Maney on the older returns, though he also wasn't deducting it as an expense on the Schedules C.

The IRS mailed Monk notices of deficiency for both years. Monk timely filed petitions, the cases were consolidated, and trial was held in Baltimore. Monk was a resident of Maryland when he filed.

## OPINION

The Commissioner claims that Monk's original position on his tax returns for 1994 through 2002--i.e., that Chuck's Place was his own Schedule C sole proprietorship--was an admission by Monk and so is the proper way to classify his interest in the bar. In support, she points out that it is Monk's name that was stated as the bar's owner on the liquor license and lottery paperwork. Monk was also the only person originally named on the bar's only bank account; even now, Maney's name is on that bank account not as an owner, but only as someone with signatory authority. Finally, it was Monk who submitted the bar's gross income and losses to the IRS, not Maney. Monk changed his position only after the audit began.

Each of these points supports the Commissioner's view that Monk actually owned Chuck's Place, although maybe as a joint venture or partnership with Maney rather than a sole proprietorship.[7] But we look at all the facts together to decide

---

[7] Characterizing any potential ownership interest as a sole proprietorship would mean classifying Monk and Maney's relationship as that of employer/employee. Nothing in the record supports this.

how to classify the friendly and informal arrangement that Monk and Maney had reached.  First, we keep the parties' own intent foremost in our consideration.  Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); Nelson v. Seaboard Sur. Co., 269 F.2d 882, 887 (8th Cir. 1959).  Second, we follow the principle that "State law determines the nature of property rights, and Federal law determines the appropriate tax treatment of those rights." Knight v. Commissioner, 115 T.C. 506, 513 (2000) (citing United States v. Natl. Bank of Commerce, 472 U.S. 713, 722 (1985), United States v. Rodgers, 461 U.S. 677, 683 (1983), and Aquilino v. United States, 363 U.S. 509, 513 (1960)).

First off, we need to decide whether Monk and Maney's initial agreement can be construed as a valid attempt to create a lease under Maryland law.  Maryland law defines a lease as "any oral or written agreement, express or implied, creating a landlord and tenant relationship, including any 'sublease' and any further sublease."  Md. Code Ann., Real Prop. sec. 1-101(h) (LexisNexis 2003).  The terms "landlord" and "tenant" are very broadly defined to include "any landlord" and "any tenant."  Id. sec. 1-101(g), (m).  And it is clear to us that there was a set monthly rent that Maney paid to Monk and the allocation of maintenance and repair expenses was understood and followed by each of them.  We therefore specifically find that Monk and Maney had a valid oral lease.  And we have previously held that valid

oral leases can be used to claim rental deductions.  See Lim v. Commissioner, T.C. Memo. 1998-432; Wy'East Color, Inc. v. Commissioner, T.C. Memo. 1996-136.  The issue then becomes whether this particular oral lease was merely a formality or had real substance.

On this issue, we find that the lease did reflect reality. One of its terms, remember, was that Monk would be responsible for any repairs on the outside of the building while Maney would be responsible for any repairs on the inside--the "swing-in, swing-out" cost allocation.  Rather than have Maney submit bills to him for any external work done, Maney would pay for it up front and subtract the amount paid from that month's rent.  We find both Monk's and Maney's testimony credible on this point and also find that this is in fact what happened.  There is ample evidence in the Dome Book that the insurance was split along the same lines, with Maney paying Monk (in addition to the monthly rent) that portion of the insurance attributable to the inside of the premises.  Both these practices show that the relationship between Monk and Maney was that of landlord and tenant.

Even more telling, however, is that Monk's financial interest--which consisted primarily of his monthly rent payment-- wasn't tied to the profits or losses of Chuck's Place.  In University Hill Foundation v. Commissioner, 51 T.C. 548, 568-69 (1969), revd. on other grounds 446 F.2d 701 (9th Cir. 1971), we

stated that one of the critical elements in determining whether a lease is actually a joint venture is whether there is "a risk of loss in the taxpayer."  In that case, the taxpayer's rent payments were directly tied to the profits of the business, but because he was not required to contribute to any losses, he had no risk of loss and therefore was not involved in a joint venture.  Id.  By this standard, Monk looks even less like a partner:  not only is he not required to contribute to any losses sustained by Chuck's Place, but he receives gross rent in the same amount each month regardless of what those profits might be.[8]

In fact, the only evidence that weighs in favor of calling Chuck's Place a joint venture, instead of calling it a business owned by Maney that pays rent to Monk, is Monk's history of listing himself as the bar's owner on his original tax returns and putting his own name on the state licensing applications and other paperwork.  But we look at these facts in the context of their old friendship.  Seen that way, this evidence looks more like one friend trying to help another who made a mistake a long,

---

[8] Maney also testified that he (and not Monk) has the bar's logo tattooed on his chest.  Though the Court did not undertake a visual inspection, we found him credible on this point.  His numerous expressions of pride in the bar and its role in the neighborhood--and the fact that it is named "Chuck's Place" and not, say, "Famous Ray's"--are additional, albeit minor, factors supporting our conclusion that the bar is his.

long time ago. Maney believed that his 40-year-old felony conviction would make fulfillment of his dream of owning a bar impossible if he filed for the licenses himself. So Monk filed the paperwork for him, not realizing how much it might matter whose name was on the liquor and lottery licenses or on the bank account. (Though we assert no expertise in Maryland administrative law, it seems unlikely that either Monk or Maney will benefit from the position on the true ownership of Chuck's Place that they have taken in this case when Maryland authorities learn of it, further bolstering their credibility on this point.)

In situations like this, where there is written documentation which contradicts the reality of a situation, we disregard the documents to properly tax the person actually earning the income. We did just this in the very similar case of Malone v. Commissioner, T.C. Memo. 2005-69, where we held that a family music business should be taxed to the children who actually ran the business and not to the parents whose names were on the legal paperwork. "[A]lthough not determinative in a general sense, in a labor-intensive business with no employees, there is a strong suggestion that the individuals performing the labor own the business." Id. Likewise, we find in this case that the profits and losses from Chuck's Place are not assignable to Monk, who had no real involvement in the business, despite the fact that he put his name on the paperwork.

In addition, neither Monk nor Maney understood the significance of Monk's submission of the Dome Book to his accountant and his reporting the business on his tax return. We believe them to be sincere, if completely mistaken, when they say they didn't think it mattered where the money was reported as long as it was reported somewhere. Although both have long practical experience as businessmen, neither has the formal education to understand the complexities of the Code--Monk has no training past high school and Maney left school after the fifth grade. And that's why Monk had a professional accountant, Hahn, take care of his somewhat complicated tax return each year.

Unfortunately, Hahn misunderstood Monk's involvement with Chuck's Place. When Monk said that he bought a bar, he meant he had bought the building, but Hahn reasonably thought Monk meant that he was running the bar himself. When the audit began, Hahn looked more closely into Monk's involvement--or, rather, lack of involvement--in Chuck's Place and saw the mistake immediately. It was this epiphany--not the expected tax consequences of the audit--that moved Hahn to amend Monk's tax returns for the previous three years and change the way Chuck's Place was reported on his later tax returns. In other words, we find the inclusion of Chuck's Place on Monk's Schedule C was a mistake rather than an admission--a mistake that was corrected as soon as it was discovered.

We also find that this mistake should not give rise to an accuracy-related penalty under Internal Revenue Code section 6662(a) (2004).  Monk provided correct information to the accountant (he gave him all the information he had), and the mistake was a result of his accountant's entirely understandable error.  That's all Monk needs to show under section 1.6664-4(b)(1) of the Income Tax Regulations.  See, e.g., <u>Westbrook v. Commissioner</u>, 68 F.3d 868, 881 (5th Cir. 1995), affg. T.C. Memo. 1993-634.

When all the evidence is considered, the picture becomes clear that Monk's relationship with Maney regarding Chuck's Place is truly that of a landlord/tenant.  Because this will trigger various computational adjustments,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.