NORTON A. HIGGINS AND BETTY K. HIGGINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Higgins v. Commissioner
Docket Nos. 4723-88; 13337-88
United States Tax Court
T.C. Memo 1990-103; 1990 Tax Ct. Memo LEXIS 101; 58 T.C.M. (CCH) 1536; T.C.M. (RIA) 90103; February 28, 1990
Thomas A. Coughlin, for the petitioners. Richard K. Delmar, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: In these consolidated *102 cases the Commissioner determined deficiencies and an addition to tax for petitioners' 1981, 1982, 1983, and 1984 taxable years as follows: Addition to Tax
Year
Deficiency
Sec. 6659
1981
$ 20,060.00
--
1982
12,907.00
--
1983
10,184.00
--
1984
3,000.49
$ 900.15
Respondent also determined increased interest pursuant to section 6621(c), [1] for each year in issue. These cases were consolidated for trial, briefing, and opinion. The deficiencies are attributable to a charitable contribution deduction for a conservation easement ("the Easement") that petitioners gave to the state of Maryland in 1981. The issues we must decide are: (1) the value for Federal income tax purposes of the Easement; (2) whether petitioners are liable for the addition to tax pursuant to section 6659 for 1984; and (3) whether petitioners are liable for increased interest pursuant to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided at Wilmington, Delaware at the time their *103 petitions were filed in this case. Petitioners purchased the property that is the subject of the Easement ("the Property") on August 2, 1972, for the sum of $ 115,000, or $ 5,049.84 per acre. The Property is located on the Eastern Shore of Maryland. Prior to purchasing the Property, petitioners spent at least two years looking at property on the entire Eastern Shore of Maryland. Petitioners purchased the Property for recreation, investment, and possibly for retirement. Petitioners paid the full asking price for the Property because they thought it was reasonable, and they knew another offer was outstanding. The Property consisted of 22.773 acres of largely cleared, unimproved farm land situated adjacent to Goose Point on the Choptank River in Talbot County, Maryland. The Property was part of Ingleside Farm, a larger property that was being subdivided. The Property is irregularly shaped with its longest side, approximately 1,241 feet, fronting on the north bank of the Choptank River. Its location on the river's north bank shelters the Property in the winter and allows it the benefit of breezes in the summer. The river is approximately one mile wide in front of the Property. *104 The Choptank River channel, which lies approximately 125 yards off-shore, is about 43 feet deep in front of the Property. The Property is on relatively high ground and enjoys full river views to the south and east. Approximately five acres of the Property is high marsh bordered by trees. This portion of the Property is in the southeast corner of the parcel, in part along the waterfront. The high marsh area lies along approximately one-half of the total shoreline, and this portion of the shoreline lies beneath the 100 year flood plain. The Property is bounded by a band of northern forest trees on the north. The Property was located in an A-2 zone under the Talbot County Zoning Ordinance in effect in 1981. Property in the A-2 zone was intended for agricultural use and for single family homesites with a minimum of two acres per homesite. Absent other restrictions, waterfront property in the A-2 zone could be subdivided into two acre homesites provided each waterfront lot retained at least 200 feet of water frontage, and minimum setbacks of 50 feet from the property boundaries and 50 feet from the mean high water mark. The deed by which petitioners acquired the Property, however, *105 restricted subdivision into not more than four homesites of a minimum of five acres each. Mr. Higgins checked the deed prior to the purchase to make sure that the Property could be subdivided. Access to petitioners' land was by a 50 foot wide, 2,442.61 foot long, gravel right-of-way which also serviced two other parcels. The Talbot County Roads Ordinance, section 13-16A.7.c, provides that "no more than six (6) parcels [may be] served by a private road." The Ordinance (sections 13-16A.1.a., 13-16A.3.a.) requires a private road to have a 34 foot right-of-way and a 12 foot wide gravel surface, with nine inches of compacted bank-run gravel or the like. Petitioners granted the Easement on the Property to the Maryland Environmental Trust on December 28, 1981. The Easement restricted improvement on the Property to one single-family residence and ancillary buildings to be situated on a contiguous three-acre homesite, and dock facilities. The Maryland Environmental Trust is a Maryland state agency whose land acquisitions are subject to approval by the Maryland Board of Public Works. Maryland's Governor, the State Comptroller, and the State Treasurer are directors of the agency. At *106 a regularly scheduled meeting on November 10, 1981, the Maryland Board of Public Works reviewed the proposed grant of conservation easement over petitioners' land and authorized the Maryland Environmental Trust to accept a Deed of Easement over the parcel of land to protect the land's significant scenic and environmental features. Pursuant to this authorization petitioners granted, and the Maryland Environmental Trust accepted, the Easement over this parcel. The Easement was granted in perpetuity and otherwise meets the requirements of a "Qualified Conservation Contribution" as defined in section 170(h). Petitioners did not receive any consideration for the Easement. Before granting the Easement, petitioners had the property appraised by James C. Latham, a real estate appraiser who was one of several recommended by the Maryland Environmental Trust. Latham estimated that the pre-easement market value of the Property was $ 212,500 and that the Easement reduced the market value of the Property by $ 95,460. Petitioners increased this amount by $ 18,740 because Latham assumed petitioners would have to pay for installation of electricity and telephone and subtracted that amount from *107 his valuation of the Property. Petitioners believed the utilities would be installed without charge. Petitioners reported a charitable contribution of $ 114,200 on their 1981 tax return. They carried the excess value of the charitable contribution forward to their 1982, 1983, and 1984 tax years. At the same time petitioners granted the Easement in December 1981, Mr. and Mrs. Hugh Daly granted a conservation easement on their 36-acre waterfront property which adjoins petitioners' property on the west. [2] The Dalys purchased their property in September 1975 for $ 90,000 or $ 2,471.848 per acre. Like petitioners, the Dalys looked for Eastern Shore property extensively before purchasing their parcel. Mr. Daly testified that petitioners' property was more desirable than his adjacent property. He built a house on his property in 1982; the house had a full eight-foot basement. Electricity and telephone service were extended to the Daly residence without charge. *108 In the summer of 1985, an Eastern Shore broker approached petitioners on behalf of a purchaser; the Property was not listed for sale. Petitioners had at least one other inquiry regarding the sale of the Property that ended when the person inquiring learned that the Easement encumbered the Property. Before selling, petitioners asked Latham to appraise the Property again. Latham appraised the Property at $ 200,000. Petitioners sold the Property, subject to the Easement, on July 22, 1985, for $ 190,000, or $ 8,343.21 per acre. Petitioners accepted the $ 190,000 offer because it was an immediate cash offer and the selling broker agreed to reduce his commission. This sales price represents an appreciation of 3.94 percent per year, compounded annually, from August 1972 when petitioners purchased the Property until the sale in July 1985. The buyer built a home on the Property and installed riprap and bulkheading along the shoreline. An adjacent property on the Choptank River of approximately 343.39 acres of land, the scenic landmark "Goose Point," improved with a historic manor house, two barns, and a pier was sold in August 1972 for $ 345,000. Like petitioners' Property, this *109 property also was part of the larger Ingleside Farm tract. The property had about 4500 feet of total water frontage along the Choptank River. Approximately 2400 feet of the waterfront was contiguous with petitioners' property on the east and north. In July 1985, the owner sold 211.2 acres of the Goose Point land, without the improvements and including the 2400 feet of waterfront on the Choptank River to the east and north of petitioners' property, for $ 625,000 (the "Goose Point property"). The Goose Point Property waterfront has about twice the shoreline of the Property and forms a peninsula contiguous with and to the north of the Property. In the notice of deficiency, respondent disallowed all but $ 22,000 of the value of the Easement based on an Engineering and Valuation Report dated May 27, 1986. Respondent now contends that the value of the Easement is $ 50,150. OPINION The principal issue for decision is the value of the Easement that petitioners granted to the Maryland Environmental Trust. The Easement satisfies the requirements of a "Qualified Conservation Contribution" provided by section 170(h). Petitioners claimed a value of $ 114,200 on their return supported *110 by an appraisal. Petitioners' expert witness appraised the value of the Easement at $ 110,000. Respondent's expert witness valued the Easement at $ 50,150. The deduction for a charitable contribution of property is its fair market value at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as "the price at which the property would exchange hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of the relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. The determination of value is a question of fact, necessarily arrived at after considering all of the relevant factors. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. The fair market value of the Easement should be based on the highest and best use of the Property at the valuation date. Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986); see sec. 1.170A-14(h)(3)(ii), Income Tax Regs. *111 The realistic and objective potential uses for the Property control. Stanley Works v. Commissioner, supra at 400. Regardless of whether an owner actually puts the property to its highest and best use, we consider "the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the near future." Olson v. United States, 292 U.S. 246, 255 (1934). Petitioners have the burden of proving respondent's determination to be incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure.
A conservation easement is normally granted by deed of gift; consequently, there is rarely an established market from which to derive fair market value. See Symington v. Commissioner, 87 T.C. 892, 894 (1986). If no comparable sales of easements are available to determine the value, the easement is generally valued by a "before and after" analysis, comparing the value of the property before the grant of the easement to the value of the property after the grant. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. *112 ; Stanley Works v. Commissioner, 87 T.C. at 399. See Hilborn v. Commissioner, 85 T.C. 677, 688 (1985). The diminution in the property's value by reason of the encumbrance is the fair market value of the easement. The before and after method is not applied mechanically, however, when other reliable indicators of market value are available. In explaining the legislation that permitted the deduction for qualified conservation contributions, the Senate Finance Committee remarked about easement appraisal methodology as follows: [C]onservation easements are typically (but not necessarily) valued indirectly as the difference between the fair market value of the property involved before and after the grant of the easement. (See Rev. Rul. 73-339, 1973-2 C.B. 68 and Rev. Rul. 76-376, 1976-2 C.B. 53.) Where this test is used, however, the committee believes it should not be applied mechanically. [S. Rept. No. 96-1007, 1980-2 C.B. 599, 606.] The regulations also provide that the before and after method is used as a "general rule (but not necessarily in all cases)." Sec. 1.170A-14(h)(3)(i), Income Tax Regs.
*113 Petitioner and respondent each presented one expert witness at trial who valued the Easement. Both expert witnesses stated that they used a "before and after" method to value the Easement, using comparable sales to ascertain values at the highest and best use for the Property. Petitioners' expert witness, Judith Reynolds, concluded that the Easement was worth $ 110,000 based on subdivision as the highest and best use for the land prior to the granting of the Easement. Respondent argues that subdividing the Property was not feasible. Respondent's expert witness, Robert S. VandeVisser, appraised the Easement at $ 50,150 after deciding that a single family residential lot was the highest and best use for the Property. Expert witnesses' opinions are supposed to aid the Court in understanding an area requiring specialized training, knowledge, or judgment. As the trier of fact, we are not, however, bound by the experts' opinions. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). *114 One expert may be persuasive on one particular element of valuation while another expert may provide more incisive help on some other element of valuation. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Consequently, using our best judgment, we may adopt some portions and reject other portions of expert testimony. Helvering v. National Grocery Co., 304 U.S. 282 (1938). Reynolds, petitioner's expert witness, is the co-owner of a real estate and consulting firm. She has authored articles on valuing easements and historic property, and has been the editor of appraisal journals. To determine a "before" value, Reynolds considered 44 sales of unimproved waterfront property on the eastern shore of Maryland, including properties in Talbot, Queen Anne, and Dorchester counties. Reynolds selected six properties, of 16 to 53 acres, as most comparable to the subject property, and adjusted their sales prices for time, size, location, and physical qualities. Reynolds' time adjustment, 8.5 percent appreciation annually, was based on the average appreciation between "matched" sales of four properties that sold both before and after the valuation date. Respondent *115 argues that Reynolds' time adjustment for her comparables is incorrect because one of the "matched" sales was of property that had been approved for subdivision between the first and second sales. Respondent misunderstands Reynolds' use of these properties. She was attempting to find benchmarks of market conditions in the vicinity not to use these properties as comparables. Reynolds' resulting time adjustment comports with appreciation rates of the better properties in the area, and we have confidence in it. Reynolds also adjusted the prices of her choice of comparables for size because large tracts sell at lower per-acre prices than small tracts. The location adjustment accounted for scenic beauty, convenience of access, sheltered locations away from northerly winds and rough water, and privacy. Physical qualities included property configuration, terrain, and water frontage. Respondent argues that property values are higher on protected Bolingbroke Creek and that Reynolds should have valued the Property at a price per acre close to the Bolingbroke Creek property sales prices. We conclude that petitioners' properties were comparable and the adjustments were reasonable. *116 Reynolds then evaluated sales prices of lots comparable to those the Property would have produced if subdivided. She concluded that the Property could have been subdivided into four lots of an average 5.69 acres and would have sold for an average of $ 80,000 per lot. She also concluded that the total, $ 320,000, would permit a purchaser to develop the Property profitably. Reynolds thus based her valuation on subdivision as the highest and best use of the Property. We agree that the Property would have sold for a price in the range of the higher priced comparable sales. Based on the adjusted comparable sales and on subdivision as the highest and best use of the Property, Reynolds concluded that the Property had a pre-easement fair market value of $ 235,000 on December 23, 1981. Respondent's expert witness, VandeVisser, was employed by the Maryland State Highway Administration and was a part-time appraiser. VandeVisser also used comparable sales to determine the "before" value of the Property. VandeVisser valued the Property as a single-family residential lot, his determination of its highest and best use. He believed that if the Property were subdivided, lot prices would be *117 low because the five-acre marsh occupies approximately half of the water frontage. He also determined that the costs associated with upgrading the road from a private road to a minor collector road, extending the road, and bringing utilities to the Property would be too great to permit profitable subdivision. VandeVisser selected three sales in the area where the Property was located as comparable and adjusted them for time, size, location, and physical characteristics. He valued the property at $ 182,184, before the grant of the Easement. A thorough review of the testimony regarding the Property along with the exhibits, including maps and photographs of the Property, convinces us that the highest and best use of the Property before the grant of the Easement was subdivision. Reynolds analyzed comparable lots and we are satisfied that lots on the Property would have sold for an average of $ 80,000. Petitioners' property was ideally situated on the north bank of the Choptank River. The Property's longest side fronted on the river. The property had a varied terrain with high open areas, some high marsh, and some trees. Reynolds illustrated that the Property could be subdivided *118 profitably into four lots averaging 5.69 acres each. Respondent argues that it was not feasible to subdivide because the lot prices would not be high enough to cover the cost of a road upgrade and extension, the cost to bring utility hook-ups to the Property, and the cost of selling the Property over time. We disagree with respondent's analysis. We believe respondent's expert witness understated the lot prices. He estimated that the lots would sell for $ 85,000, $ 70,000, $ 50,000, and $ 30,000, because of the high marshland along part of the waterfront. We agree with petitioner, however, that the high marshland and trees would provide a lovely view for a homesite, rather than detract from the Property's value. Moreover, VandeVisser did not analyze comparable lot sales. Respondent's expert also overstated the developing costs. The city ordinance did not require the upgraded road that VandeVisser used in his calculations. In addition, the evidence in the record on the cost of extending utilities suggests that their extension to the Property would not be charged to the owner of the Property. We reject VandeVisser's valuation because he premised his analysis on the incorrect *119 assumption that the highest and best use was of the Property as a single-family residential lot. Because of this fundamental error, VandeVisser's report does not aid us in determining the value of the Easement. Petitioners' expert witness is well-qualified to value the Easement and presented a well-reasoned opinion on its value. Reynolds' sound valuation corroborated the appraisal that petitioners acquired at the time of the gift of the Easement. The "after" value is the Property's value used for a single homesite, three acres of which could be improved. Neither expert took the traditional approach to establish the "after" value. Neither expert witness used comparable sales of property encumbered by conservation easements in 1981 to determine the "after" value of the Property at the time petitioners gave the Easement. Instead, both Reynolds and VandeVisser applied the percentage decrease from their 1985 estimated sales price of the Property without the Easement to the actual 1985 sales price of the Property, to adjust the "before" value. We agree, however, that the "before and after" test need not be applied mechanically. Because the 1985 actual sales price of the Property *120 provides concrete evidence of this Property's value after grant of the Easement, we believe that Reynolds appropriately used the 1985 sales price as a starting point to determine the 1981 "after" value. We accept this analysis as appropriate under the circumstances of this case. Reynolds estimated a 1985 selling price of the Property without the Easement by reference to the appreciation between 1972 and 1985 of the adjoining Goose Point property. The Goose Point property, a much larger parcel than petitioners' and not subject to a conservation easement, was sold in 1972 and again in 1985 (the same years that petitioners purchased and sold the Property). By reference to the appreciation in price of the Goose Point Property between 1972 and 1985, Reynolds determined that the Property, which sold for $ 115,000 in 1972, would have sold for $ 338,000 in 1985 without the Easement. The 1985 sales price per acre was 2.94 times the 1972 per-acre sales price. In 1972, the Goose Point property sold was 343 acres, and in 1985, the property sold was 211.22 acres. The Property's sale in 1985 for $ 190,000 was $ 148,000 less than the value that Reynolds determined the Property would have sold *121 for if it were not encumbered by the Easement. This diminution in value from $ 338,000 to $ 190,000 by reason of the Easement was 43.8 percent. Respondent argues that the appreciation per acre of the Goose Point property between 1972 and 1985 is overstated because the 1972 sale was of a larger parcel. There is potential for distortion because of the differences in the acreage sold. Two facts reduce this distortion: first, the higher price per acre in 1972 was higher than it would have been for raw land because of the inclusion of the house, two barns, and pier on the larger 1972 parcel, and second, petitioners' expert witness convinced us that the Goose Point property sales provided almost perfect data and that petitioners' property would appreciate at least at the rate of the Goose Point property. The close comparability of the two properties is clear notwithstanding that the Goose Point property was larger. The 8.72 percent compounded annual rate of appreciation derived from the Goose Point Property sales is consistent with the 8.5 percent time adjustment factor derived from Reynolds' "matched" sales for overall market conditions. Using the same Goose Point property appreciation *122 rate, Reynolds next determined that the Property's value in December 1981 would have been $ 250,000 before the grant of the Easement. A loss of 43.8 percent in value is $ 110,000. We believe that this resulting figure is erroneous, however, because Reynolds incorrectly applied the 43.8 percentage diminution to her derived figure of $ 250,000 instead of to the before value of $ 235,000. Applying the 43.8 percentage diminution to $ 235,000, the Easement's value would be about $ 103,000. Respondent argues that using only one comparable is insufficient. Normally, one sale would not provide a sufficient basis for valuation. Reynolds, however, did not use only one property sale in isolation. She used the single most similar property and compared her results with the appreciation rate of other comparable properties as well. Petitioners have carried their burden of proving that respondent's determination is erroneous. They have also shown that respondent's expert based his valuation for trial on a wrong assumption of the highest and best use of the Property. Petitioner's expert's valuation was reliable, and we find the value of the Easement to be $ 103,000. Respondent determined *123 the section 6659 addition to tax for valuation overstatements for 1984, and the section 6621(c), I.R.C. 1986, increase in interest for underpayments attributable to a tax motivated transaction for all years. Section 6659 provides for an addition to tax if an underpayment of tax exceeding $ 1,000 is attributable to a valuation overstatement. A valuation overstatement exists if the value of property, or the adjusted basis of property, claimed on a return is 150 percent or more of the correct value. Sec. 6659(c). The value of the Easement claimed on the return, $ 114,210, does not exceed 150 percent of the correct value, $ 103,000. The threshold requirement for imposing section 6659, therefore, is not met. Likewise, there is no valuation overstatement for purposes of section 6621(c)(3)(A)(i). We hold that the addition to tax and increases in interest do not apply. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated.↩
2. To support their valuation, petitioners offered evidence of the amount respondent suggested the Dalys' conservation easement was worth. Respondent moved to exclude this evidence as evidence in compromise pursuant to Federal Rule of Evidence 408↩. We need not decide this issue because the evidence without this figure is more than adequate to support the value for the Easement that we find.