T.C. Memo. 2020-159

UNITED STATES TAX COURT

KUMAR RAJAGOPALAN AND SUSAMMA KUMAR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

WARREN C. SAPP AND JAMIKO SAPP, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21394-11, 21575-11.          Filed November 19, 2020.

<u>Michelle A. Levin</u>, <u>Ronald A. Levitt</u>, <u>Gregory P. Rhodes</u>, and <u>David Mace Wooldridge</u>, for petitioners.

<u>Clint Locke</u> and <u>Christopher A. Pavilonis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Conservation easements are to the Commissioner what aunts are to Bertie Wooster:  "It is no use telling me there are bad aunts and good

**[\*2]** aunts. At the core, they are all alike. Sooner or later, out pops the cloven hoof." P. G. Wodehouse, The Code of the Woosters 40 (2d Vintage Books ed. 2015). The cloven hoof in these cases is attached to an LLC named SS Mountain, which assembled and then divided a tract of property into one part for a small development of large homes and into another part with a conservation easement, all at the very peak of an amazingly frothy local real-estate market in 2006.

The Commissioner's expert testified both that the easement was donated at nearly the top of the market and that the property *unencumbered* by the easement was worth less than the donor had paid to acquire it. Petitioners' expert agreed that the easement was donated at nearly the top of the market but concluded that its value unencumbered by the easement was less than what a contemporaneous bank appraisal said it was. It turns out, however, that there is unusually good transactional information about this property. The transactions were largely between well-informed, unrelated parties who relied on contemporaneous appraisals and put their own money at risk. Warren Sapp, one of the petitioners in these cases, but wholly unschooled in the arcana of real-estate valuation, observed at trial that "if [the property's] not worth it, the bank [won't] loan you the money."

We must decide whether Sapp or Wooster is the wiser.

**[*3]**                                    FINDINGS OF FACT

I.      SS Mountain, LLC

Kumar Rajagopalan and Warren Sapp were members of SS Mountain, LLC,

a North Carolina LLC formed in September 2004.  Less than a month before SS

Mountain's formation, some of its future members began buying up land in

Haywood County, North Carolina--a mountainous area in the western part of the

state.  They bought seven parcels between August 2004 and July 2005 for a total

of just under $3 million.  Here's a summary (and we've included the data for the

sales before the sale to SS Mountain to show something of the remarkable price

trends the trial unveiled):

| Sale date | Sale price | Site size (in acres) | Price-per-acre | Previous sale date | Price-per-acre of previous sale |
|---|---|---|---|---|---|
| August 2004 | $495,000 | 13.03 | $37,989.00 | May 1988[1] | $1,760.95 |
| August 2004 | 763,000 | 47.383 | 16,102.82 | April 2003 | 4,801.30 |

---

[1] Note that this was a purchase for a slightly larger piece of land--18.03 acres, to be exact.

| [*4] | | | | | |
|---|---|---|---|---|---|
| October 2004 | 370,000 | 19.50 | 18,974.36 | January 1997 | 3,333.33[2] |
| December 2004 | 750,000 | 30.29 | 24,760.65 | April 2001 | Price unknown |
| July 2005 | 575,000 | 10.03 | 57,328.02 | August 1988 | 1,769.69 |
| Total | 2,953,000 | 120.233 | N/A | N/A | N/A |

These purchases were all completed at arm's length and financed by banks after the completion of their own appraisals. At the beginning of 2005, the first group of parcels was transferred to SS Mountain by the member in whose name it had been bought. SS Mountain bought the fifth parcel in its own name in July 2005.

Credible testimony described the natural beauty of this corner of western North Carolina. And now that SS Mountain owned one big, beautiful piece of it, the members had to decide what to do. The land was only two miles from an exit off Interstate 40, in a part of the state where luxury homes for out-of-staters had begun to take root and flourish. The members met with Fred Bonci--a land

---

[2] There was another sale of this property in March 2004 for $31,750, or $1,538.46/acre. We do not know what caused the almost 50% decrease in value between 1997 and 2004, nor what explains the more-than-twelve-times increase in value between March and October 2004. However, excluding the March 2004 sale as a clear outlier, the general trend from 1997 to 2004 is consistent with that for the other plots acquired by SS Mountain.

[*5] developer who had worked on the development of the Biltmore Estate--to discuss their options. And as they saw it, there were only two: subdivide the entire parcel and sell the lots as homesites for "a whole bunch of money;" or subdivide some and keep the rest as beautiful as it was in its natural state. One plan would have led to a residential subdivision of 37 lots. The other would create only a 12-lot subdivision with open space on the rest. They chose the latter.

To implement this plan, the members spoke with a number of professionals. Carol King, a local CPA, advised them of its tax benefits. Cindy Eller, a local lawyer with the Van Winkle Law Firm, advised the members about the mechanics of donating an easement. And Dave Roberts, a qualified appraiser, completed an appraisal of the potential easement.

While the paperwork for the conservation easement was being worked out, SS Mountain began selling lots in the soon-to-be 12-lot subdivision. The lot sizes ranged from 1.53 acres to 5.61 acres. In August 2006, Dr. Kumar contracted to buy Lot 7, which was roughly 3.6 acres in size, for $750,000. In September, SS Mountain sold two lots of two acres each: Lot 1 went to DC Wrightway Investments, LLC; and Lot 3 went to Kennard Campbell. It also sold a third lot of approximately 1.8 acres--Lot 9--to Don Danielson. The latter three buyers paid $750,000, and none were members of SS Mountain. All the buyers, including Dr.

[*6] Kumar, also placed their own money--deposits that ranged from $5,000 to $100,000--in escrow when they contracted to buy these lots. Here is a summary of these transactions:

| Party | Transaction | Amount in escrow | SS Mountain member |
|---|---|---|---|
| Kumar | Contracted to purchase Lot 7 for $750,000 | $100,000 | Yes |
| DC Wrightway Investments, LLC | Contracted to purchase Lot 1 for $750,000 | 75,000 | No |
| Campbell | Contracted to purchase Lot 3 for $750,000 | 75,000 | No |
| Danielson | Contracted to purchase Lot 9 for $750,000 | 5,000 | No |

That same month, HomeTrust Bank lent SS Mountain $5 million secured by the 12 lots. We note this is $2 million more than it cost SS Mountain to assemble the entire 120 acres. But HomeTrust had itself completed an appraisal of those lots, which showed each had a value of more than $750,000. As part of the financing deal, HomeTrust included a clause that required SS Mountain to sell the remaining lots for a minimum of $750,000 each. And Haywood County tax

[*7] records[3] show that ten of the lots had values that ranged between $875,240 and $2,102,320 as of January 1, 2006.[4]

On November 28, 2006, SS Mountain contributed a conservation easement over 89.378 acres to the North American Land Trust (NALT). The parties stipulated that the NALT was a qualified charitable organization and that the easement was exclusively for a conservation purpose. One provision in the easement allowed the parties to agree to amendments, but only those

> which are not inconsistent with the Conservation Purposes; provided, however, that Holder [i.e., the NALT] shall have no right or power to agree to any amendments hereto that would result in this Conservation Easement failing to qualify as a valid conservation agreement under the "State Conservation Easement Law", as the same may be hereafter amended, or as a qualified conservation contribution under Section 170(h) of the Internal Revenue Code and applicable regulations.

---

[3] The Haywood County property tax records were from 2008. North Carolina law requires that real estate be appraised at least once every eight years. See N.C. Gen. Stat. § 105-286(a) (2006). Haywood County, however, had chosen to reappraise the properties every four years, beginning in 2002. See *FAQs Taxes--Property Reappraisal*, Haywood County, NC, https://www.haywoodcountync.gov/Faq.aspx?TID=31 (last visited Sept. 2, 2020). Therefore, the values on the 2008 tax records actually show the appraised value as of January 1, 2006--the year of donation. See Haywood County Finance Department, Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2010, at 133 (2010).

[4] Lot 11 was the only one that had a low value--only $67,720. The record has nothing to explain why this property is an outlier.

**[\*8]**   After SS Mountain granted this easement, it still had 8 unsold lots.  Sapp bought Lot 6 from SS Mountain on September 21, 2007 for $1.1 million. HomeTrust Bank lent him $900,000 for the purchase based on an independent appraisal--which showed the lot was still worth at least $900,000.

SS Mountain realized it couldn't close these sales contracts "until the roads were in and the electric was in"--something that it had not anticipated.  And this couldn't be done quickly--it involved dynamiting some of the land to build the roads--which meant further delays.  And during this delay, as many Americans are painfully aware, the market began to crumble in 2007.  This combination of the initial delay and then the subsequent market crash caused at least some of the contracts for lots within the soon-to-be subdivision to not close.

II.    Reporting

SS Mountain timely filed its 2006 Form 1065, U.S. Return of Partnership Income,[5] in July 2007.  On its Form 1065, SS Mountain reported a noncash charitable contribution of $4,879,000 for the donation of the conservation

---

[5] Although SS Mountain is an LLC, it files its returns as a partnership as permitted by regulation.  See sec. 301.7701-3(a), Proced. & Admin. Regs. Partnerships don't actually pay taxes, but file a Form 1065 as an information return, and the income "flows through" to its partners.  See sec. 701; 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49, at \*4 n.3, \*44.  (All section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.)

[*9] easement to the NALT. It attached a qualified appraisal of the conservation easement. It then issued Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., to the partners, including Kumar and Sapp.

The Kumars timely filed their Form 1040 for 2006 in October 2007. They claimed a flowthrough noncash charitable contribution of more than $190,000 for the donation of the conservation easement. The Sapps also timely filed their Form 1040 for 2006. They claimed a flowthrough noncash charitable contribution of more than $2.1 million for the donation. Both the Kumars and the Sapps attached qualified appraisals to their returns.[6]

III.    Audit and Trial

The Commissioner issued notices of deficiency to both the Sapps and the Kumars in which he asserted deficiencies and penalties under section 6662(a) for tax year 2006. Both couples timely filed petitions, and we tried the cases in Birmingham, Alabama.[7] We are left to decide:

---

[6] The parties stipulated that Sapp is entitled to a flowthrough amount of 60% of the noncash charitable contributions made by SS Mountain, and Kumar is entitled to a flowthrough amount of 4%.

[7] The Sapps and the Kumars resided in Florida when they filed their petitions, which means the Eleventh Circuit is the presumptive appellate venue. See sec. 7482(b)(1)(A).

**[*10]**   ●   whether the conservation easement was a contribution of a qualified property interest,

●   the value of that easement, and

●   whether penalties apply.

OPINION

I.    Contribution of a Qualified Property Interest

The Code generally disallows a charitable-contribution deduction for any gift of real property that "consists of less than the * * * entire interest in such property." See sec. 170(f)(3)(A).  An exception to this general prohibition on the donation of partial interests is made for the donations of conservation easements, see sec. 170(f)(3)(B)(iii), some of which can be quite sizable, see, e.g., Oakbrook Land Holdings, LLC v. Commissioner, T.C. Memo. 2020-54, at *5.  The Code encourages donation of conservation easements to preserve properties with natural, historical, or cultural significance through perpetual restrictions on their use.  See id. at *11.

To take advantage of this contribution, a donor must meet unusually complicated rules.  A "qualified conservation contribution" is "a contribution (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes."  Sec. 170(h)(1).

**[\*11]** Although a contribution must satisfy each of these requirements, many of our recent opinions have focused on the first and third requirements--that the contribution be "a qualified real property interest," see, e.g., Pine Mtn. Pres., LLLP v. Commissioner, 151 T.C. 247, 265-72 (2018), aff'd in part, rev'd in part, vacated and remanded, __ F.3d __, 2020 WL 6193897 (11th Cir. Oct. 22, 2020), and that the contribution be "exclusively for conservation purposes," see, e.g., Oakbrook, at \*14. Attacking the conservation deed on these technical grounds has allowed the Commissioner to deny deductions in full and even win penalties. The Commissioner disarmed himself of such arguments in these cases when he chose to stipulate that this easement was "exclusively for a conservation purpose." See supra p. 8. We enforce stipulations unless a party was misled, there was a mutual mistake, or justice requires, see Buchsbaum v. Commissioner, T.C. Memo. 2002-138, 2002 WL 1150779, at \*3 (citing Rule 91(e)), none of which has occurred here.

The Commissioner argues as to the first requirement that the deed violates section 170(h)(2)(C)'s requirement that the restriction be granted in perpetuity. The deed does have an amendment clause that allows the parties to modify certain restrictions in the deed of easement. See supra p. 8. The Commissioner argues that this deprives the easement of the required perpetuity. We expressly rejected

**[*12]** this argument in <u>Pine Mountain</u>, 151 T.C. at 280-81, and will follow that opinion here, as we must. <u>See, e.g.</u>, <u>Security State Bank v. Commissioner</u>, 111 T.C. 210, 213-14 (1998), <u>aff'd</u>, 214 F.3d 1254 (10th Cir. 2000).[8]

What's left is a dispute about value.

II.    <u>Valuation</u>

A.    <u>Background</u>

This valuation contest is an odd one. The value of a conservation easement donated under section 170 is its fair market value (FMV) at the time of the contribution. Sec. 1.170A-14(h)(3)(i), Income Tax Regs.; <u>see also</u> secs. 1.170A-1(c)(1), 1.170A-7(c), Income Tax Regs. FMV is the "price at which the property would change hands between a willing buyer and a willing seller." Sec. 1.170A-1(c)(2), Income Tax Regs. To determine the FMV, the regulations require us to first try to use sales of property with easements comparable to the donated easement, if there is a substantial record of such sales. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. Here, it appears no such records exist.

---

[8] We also note that the Commissioner, despite having appealed the issue in <u>Pine Mountain</u>, <u>see</u> Principal and Response Brief for Commissioner at 59, <u>Pine Mtn. Pres., LLLP v. Commissioner</u>, is no longer making this argument in litigated cases, <u>see</u> G.C.M. AM 2020-001 (Mar. 17, 2020).

**[\*13]** If there is no substantial record of comparable sales, the FMV of the easement is "the difference between the [FMV] of the property it encumbers before the granting of the restriction and the [FMV] of the encumbered property after the granting of the restriction"--also known as the before-and-after test. See id. To determine the FMV of the conservation easement, we must consider not only its current use, but the property's highest and best use before and after the easement grant. See sec. 1.170A-14(h)(3)(ii); see also Hilborn v. Commissioner, 85 T.C. 677, 689-90 (1985).

The two methods generally used to determine the "before value" and the "after value" are the comparable-sales and income methods.[9] The comparable-sales method looks at transactions that involve properties similar to the subject property, completed at arm's length, and sold within a reasonable time of the valuation date. See, e.g., Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979); Butler v. Commissioner, T.C. Memo. 2012-72, 2012 WL 913695, at *16. The income approach projects the *future* cashflows the property will generate at its highest and best use. See, e.g., Butler, 2012 WL 913695, at *16;

_____

[9] A third method known as the "cost approach" or "replacement cost approach" is also often used for property valuation, see, e.g., Hilborn, 85 T.C. at 689, but both parties' experts agreed that this method was inappropriate for "vacant land," like the property at issue.

[*14] <u>Trout Ranch, LLC v. Commissioner</u>, T.C. Memo. 2010-283, 2010 WL 5395108, at *4, <u>aff'd</u>, 493 F. App'x 944 (10th Cir. 2012). This method assumes that an investor would pay no more than the present value of the property's anticipated future income. <u>Butler</u>, 2012 WL 913695, at *16.

Here, both parties brought in experts for trial. Both were qualified and thoughtful, and both were generally credible. Such experts can help us understand the evidence or help us decide a fact in issue. <u>See, e.g.</u>, Fed. R. Evid. 702; <u>Kiva Dunes Conservation, LLC v. Commissioner</u>, T.C. Memo. 2009-145, 2009 WL 1748862, at *3. We are not bound by any expert opinion. <u>See</u> <u>Helvering v. Nat'l Grocery Co.</u>, 304 U.S. 282, 295 (1938); <u>Kiva Dunes</u>, 2009 WL 1748862, at *3. We can accept or reject their testimony based on our judgment. <u>See</u> <u>Nat'l Grocery Co.</u>, 304 U.S. at 295; <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 217 (1990); <u>Kiva Dunes</u>, 2009 WL 1748862, at *3. We don't, however, have to accept an expert opinion, but may instead use our own computation or analysis. <u>See, e.g.</u>, <u>Trout Ranch</u>, 2010 WL 5395108, at *8 ("We find none of the experts completely convincing. We shall discuss their assumptions and their arguments, and we shall then construct our own [income method] analyses to calculate the before and after value of the property"); <u>Peracchio v. Commissioner</u>, T.C. Memo. 2003-280, 2003

**[*15]** WL 22211417, at *3 ("[W]e may be selective in determining what portions of each expert's opinion, *if any*, to accept") (emphasis added).

The Kumars and the Sapps hired George P. Galphin, Jr., president of the Chattahoochee Valuation Group, to value the property at trial. Galphin used both the sales-comparison and income methods. He valued the land before the placement of the conservation easement (i.e. the before value) at $4,150,000 and an after value of $1,250,000. If he's right, the conservation easement had an FMV of $2,900,000.

The Commissioner hired Richard Marchitelli, executive managing director of Cushman & Wakefield of North Carolina, Inc. Marchitelli used only the sales-comparison approach to value the subject property. He determined a before value of $1,280,000 and an after value of $560,000. If he's right, the conservation easement had an FMV of only $720,000.

The Kumars and the Sapps, after careful review of both experts' testimony and the evidence that came out at trial, urge us to uphold their initial valuation of the easement--$4,879,000.

B.    The Value of This Conservation Easement

Everyone agrees that a 37-lot subdivision plan was the property's highest and best use before the easement, and a 12-lot subdivision with the conserved area

**[\*16]** as open space was the property's highest and best use after the easement.[10]

We value the property in two parts:

- the 12 lots that were going to be developed after placement of the conservation easement, and

- the other 25 lots whose development was forgone because of the easement.

As we begin our own valuation of this piece of western North Carolina, we must acknowledge how odd the facts of this case are compared to those of most conservation-easement cases. When we try to value conservation easements, past sales of the property at issue usually have limited usefulness because they turn out to be sales that happened too long ago or were transfers between related parties. This is why experts typically look to transactions that involve nearby comparable properties to determine the FMV of the property at issue.

But that just isn't the case here. This property had a recent and reliable, and therefore relevant, transactional history. SS Mountain first acquired this land for just under $3 million in 2004 and 2005. All of its acquisitions were from

---

[10] Haywood County has no zoning, and a fairly unburdensome subdivision law seems to have encouraged the development of a luxury second-home market in the first decade of the century. We will agree with the parties and find that this 37-lot subdivision plan is the property's highest and best use, but we do note that it left 35 acres undeveloped despite their being physically and legally possible to develop.

[*17] unrelated third parties, conducted through an unrelated real-estate broker, completed at arm's length, and financed by a bank or banks that did their own appraisals.

Then, before it donated the conservation easement, SS Mountain contracted to sell four of the proposed subdivision lots for $750,000 each--and three of these were to unrelated parties. Each of these buyers put up real money in escrow in amounts that ranged from $5,000 to $100,000.

At about the same time, HomeTrust Bank--which is not a member or related to any member of SS Mountain--lent SS Mountain $5 million secured by the 12 lots. The Bank did this in the normal course of its own business and, before lending the money, got another independent appraisal that showed that the remaining lots were each worth at least $750,000.[11]

In September of 2007--after SS Mountain donated the conservation easement--Sapp bought one lot for a whopping $1.1 million, financed by a

---

[11] The appraisals are not in the record. We heard reliable testimony from the member manager of SS Mountain that the bank valued these lots at an amount greater than $750,000. And the bank included as a term in the loan that these lots couldn't be sold for less than $750,000 each. This leads us to conclude that it is more likely than not that the bank's own independent appraisal found the remaining lots to be worth at least $750,000 each (and the $5 million principal amount of the loan would be an average of $625,000/unsold lot--which would give the bank the sort of equity cushion one would expect a bank to want).

[*18] $900,000 loan from HomeTrust Bank.  Though Sapp was a member of SS Mountain, an independent appraisal by the bank before the grant of the loan showed the lot was worth at least this amount.[12]  We find this transactional history reliable and relevant.

The 2008 Haywood County property-tax records--which reflect assessments as of the beginning of 2006, the same year SS Mountain granted the easement-- also show high FMVs.[13]  These assessments were for 11 lots in both what became the proposed subdivision and what became the land subject to the conservation easement.  Here are the data:

| Property | Value |
| --- | --- |
| Lot 1 | $1,090,360 |
| Lot 2 | 1,166,320 |

---

[12] The bank's appraisal of the Sapps' lot is also not in the record.  However, for the same reasons, we find it more likely than not that this appraisal showed that Lot 6 was worth at least $1.1 million.

[13] The Commissioner argues against reliance on Haywood County's property tax records because they don't distinguish between the value of the land and any buildings.  But there were no buildings on these lots at the relevant times except for one log cabin, which would be destroyed under the terms of the conservation easement, and one ranch house on the easement property.  Both experts agreed on this.  Even if the county tax records don't distinguish between the value of land and residences on that land, on these facts the entire value must be attributed to the land itself.

[*19]

| | |
|---|---|
| Lot 3 | 1,060,630 |
| Lot 4 | 992,350 |
| Lot 5 | 1,002,380 |
| Lot 6 | 1,090,360 |
| Lot 7 | 1,628,360 |
| Lot 8 | 2,102,320 |
| Lot 9 | 875,240 |
| Lot 10 | 1,245,110 |
| Lot 11 | 67,720 |
| Conservation easement | 814,500 |

The transactional history, bank loans, and county tax records all show two things: that the purchase prices around the date of the easement are reliable valuations and that any lot in this hypothetical residential subdivision (with the single and unexplained exception of Lot 11) was worth at least $750,000 at the time the conservation easement was placed. Cf. Higgins v. Commissioner, T.C. Memo. 1990-103, 1990 Tax Ct. Memo LEXIS 101, at *19-*20 (using recent transactions of subject property instead of comparable-sales method).

This gets a good start on a "before value." We look first at the 12 lots that were going to be developed even after the placement of the conservation easement. Of these 12, 4 were under contract at the time of easement--3 of which were with unrelated parties--to sell for a combined value of $3 million. We find it

[*20] more likely than not that this $3 million is a reliable value for these properties.

That leaves the eight unsold lots. We conservatively value them at $5 million. In addition to the purchase contracts that indicate that lots in this subdivision were worth $750,000 each as of late 2006, an unrelated bank lent $5 million to SS Mountain secured by those lots in September 2006. The loan required that each of the remaining unsold lots be sold for at least $750,000. And the bank's own appraisal showed that these unsold properties were worth at least this much. Though we think a value for each of the remaining unsold lots of $750,000 would be reasonable, we will be conservative and find that these eight lots have a combined value of $5 million. Therefore, we find it more likely than not that these 12 lots together had an FMV of $8 million as of the easement date.

To come up with a "before value" for the other 25 lots, we do not have such hard data. It would not be completely unreasonable to find that each of these lots would also have been worth at least $750,000 each--their mix of views and sizes were about the same as the 12 developable lots.[14] This value would be supported

---

[14] For a hypothetical residential development on the property, both experts at trial used the plans developed by LaQuatra Bonci Associates and included in David Roberts's appraisal (the one used by SS Mountain, the Kumars and the Sapps for their tax returns). Roberts detailed that the 37-lot plan contained 20 lots

(continued...)

[*21] by HomeTrust Bank's willingness to lend $5 million secured by the remaining unsold lots. It would also be supported by the four contracts signed before SS Mountain donated the easement.

That would make their combined FMV $18.75 million, and the "before value" of the SS Mountain property would be $26.750 million.

| Lot Group | Value |
|---|---|
| The first 12 lots | $8,000,000 |
| The other 25 lots | 18,750,000 |
| Total | 26,750,000 |

But doing so would entail a conclusion that property assembled less than three years before the easement's donation at a cost of slightly less than $3 million had nonupled in value. There is more than enough evidence in the record that the real-estate market in this part of the country was in the expansionary phase of a bubble in 2006, but that just wouldn't pass a sanity check.

---

[14](...continued)
with good views ranging from 2 to 4 acres in size and 17 interior sites with average views also ranging from 2 to 4 acres. He detailed that the 12-lot plan had an even mix of 6 exterior lots with superior views and 6 interior lots with average views. The sizes of these lots ranged from 1.53 acres to 5.61 acres. We find that the 25 undeveloped lots would contain a mix of size and views similar to those of the 12 developed lots.

**[\*22]** We do find that the "after value" of the 12 lots would be $8 million based on the transactional history and Haywood County property tax records.[15]  Section 1.170A-14(h)(3)(ii), Income Tax Regs., and the corresponding subparagraph 4, Example (10), do require us to take into account the effect a conservation easement would have on increasing the value of the remaining property.  The Commissioner's expert, Marchitelli, said that the 12 unencumbered lots would benefit from the conservation easement since their long-range views will be preserved.   Marchitelli even concluded that this benefit would cause a 20% increase in value to the unencumbered land.[16]

Petitioners' expert, Galphin, disagreed and concluded that the unencumbered land posteasement would be worth *less*--nearly 7% less to be exact. He reasoned that a main effect of the conservation easement would be to make construction of roadways more costly for each of the remaining developable lots. We note two things about the unencumbered lots after the easement:  They are

--------

[15] There is a very slight difference in size of the 12 lots in the 37-lot plan versus the 12-lot plan.  The average lot size in the 12-lot plan is 2.6 acres (30.897 divided by 12).  The average lot size in the 37-lot plan is 2.3 acres (85.205 divided by 37--only 85.205 acres were actually developed under the plan used by the experts).

[16] And though not mentioned by the Commissioner, the lot sizes in the after plan are larger by 0.3 acres on average.

[*23] clustered into two groups, which means that not all lots will have grand unencumbered views--in fact, only half of the lots will have great views. These lots would also have to bear a much greater cost per lot--nearly double, in fact--of developing the infrastructure (such as roads and utility access) needed to build on them.

We find that both experts are partly right. The easement does ensure that remaining plots' long-range views are preserved "in perpetuity," and the development plan does make them of slightly larger size. Other things being equal, these factors would increase the "after value" of those lots. But not all of these lots will have grand views either before or after. And the easement also will significantly increase the cost per lot of building on the unencumbered property, which would decrease the value of the 12 lots. On balance, we find that these effects would cancel each other out. As for the land encumbered by the easement, open space still has some value and we will assume the Commissioner is correct that its value here was $560,000.

Even with these qualifications, we conclude that the amounts claimed by the Kumars and the Sapps were reasonable. We do so after looking at the puzzle in two different ways. They claimed a value of $4,879,000. We have found that the "after value" of the conserved land was $560,000 and the "after value" of the

**[*24]** developable land was unchanged from its "before value."  For the deduction

to be sustained, the "before value" of the conserved land would have to be at least

$5,439,000.

We've also found that the lots planned for the conserved area were

comparable to the lots in the developable area.  See supra p. 20 and note 14.  So

one way to look at the problem is to divide $5,439,000 by 25.  That equals

$217,560/lot in "before value."  There is no evidence in the record that SS

Mountain's lots (apart from the weird assessed value of Lot 11) were worth

anything like that low a value as of the date of the easement.  Their proximity to

$750,000 lots of similar size and similar views might not mean that all of them

were worth a minimum of $750,000, but neither of the experts and none of the

witnesses suggest any difference in their value that leads us to find it reasonable to

think they were worth less than $217,560 during the bubble when SS Mountain

donated the easement.

Or we could look at the problem from the viewpoint of price per acre.

There is plenty of credible evidence that land prices per acre were booming in the

years before the easement's creation in late 2006.  The Commissioner's expert

even testified that prices were going up at least 2.5% a *month* in 2006 and 2007.

And this bubble had been inflating for years.  See supra p. 4 (showing a rapid

[*25] increase in per-acre value during 2004 and 2005, as well as a general increase in value since the last purchase of the property). The implicit claimed "before value" is $5,439,000. If one divides it not by the number of lots, but by the number of acres, one gets a price per acre of $60,854. Is this reasonable? Consider the price per acre of the last parcel SS Mountain acquired in July 2005: $57,328. Inflate it by what the Commissioner's own expert said was reasonable-- 2.5% a month for 16 months--and one gets a price per acre of $85,104--an amount substantially higher than what the taxpayers claimed on their returns. And even that doesn't show how crazy the inflation in land prices was.

The land on which 10 of the 12 lots sits is located mostly on a portion of land SS Mountain purchased in December 2004 for $750,000, or $24,761 per acre. If these lots were worth $750,000 each at the time of donation--as the tax records, bank loans, and arm's-length purchases suggest--then the price per acre as of November 2006 was $247,606--a 1000% increase. We need not determine whether this 1000% value increase can be attributed to the entire property--but we can use it as evidence that there truly was a real-estate bubble at the time of the donation.

In both these exercises, one comes up with a value that makes the deduction claimed by SS Mountain and that flowed through to the Kumars and the Sapps

[*26] entirely reasonable--if reasonable only because we have to look at it from within the market bubble that existed at that time. We find, from all these different perspectives, that the FMV of the conservation easement is *at least* the amount claimed by SS Mountain (and that flowed through to Kumar and Sapp)-- $4,879,000.

## C. The Experts

We certainly acknowledge how unusual it is in a valuation case to not find a number somewhere between those of the experts who battled it out at trial. As a check on our reasonableness, we need to take a closer look at what they did, and try to figure out why we and they diverge.

### 1. Marchitelli

The Commissioner's expert acknowledged in his report that Uniform Standards of Professional Appraisal Practice require an appraiser to consider any sales of the subject property within three years of the effective date of valuation. Marchitelli testified that he declined to rely on the 2004 and 2005 purchase prices in his analysis because he thought the numbers were so crazy that the sales couldn't possibly have been at arm's length. He concluded that the original purchases of the properties that made up SS Mountain's tract couldn't be representative of the property's FMV. We think this premise is simply wrong--we

**[*27]** heard the testimony and looked at the evidence, and these showed that those original purchases were for the FMV.

Marchitelli determined that the property's "before value" was $1,280,000. This valuation *must* be a vast understatement of the property's value as of November 2006. It is less than what SS Mountain paid for the property in 2004 and 2005--$3 million. All of SS Mountain's assembly deals during those years were with unrelated parties. All were completed with the help of an independent real-estate broker. All were financed with loans backed by independent appraisals. And, since Marchitelli admitted that real-estate prices were increasing rapidly for years before the donation, and that the market was near its height at the very time of donation, we see no way that property bought in 2004 and 2005 for $3 million could be worth less than $1.3 million when assembled and subdivided two years later. We could understand ignoring these transactions if they weren't at arm's length, but that wasn't the case here. (And we certainly don't fault Marchitelli for his skepticism--he's a skilled appraiser, not a skilled litigator. He couldn't summon and examine witnesses and get documents produced as litigators can.)

**[\*28]**     2.     <u>Galphin</u>

Galphin's position provides more of a challenge for us.  But we can summarize the differences between our analysis and his with a simple observation--Galphin relied primarily on transactional data of *other* properties; we relied on transactional data of the *specific* property at issue.  When a property's value is in question, and it has this level of transactional data, it would be unreasonable to ignore it.  <u>See</u> <u>Cave Buttes, LLC v. Commissioner</u>, 147 T.C. 338, 357 (2016) ("[FMV] is a question of fact to be determined from *all relevant evidence* on the record") (emphasis added); <u>see also</u> <u>Dorsey v. Commissioner</u>, T.C. Memo. 1990-242 (using recent transactional data of subject property to determine FMV of conservation easement).  And we find a valuation based on the transactional data for this property to be more reliable.  We also can understand what happened.  As explained by petitioners' counsel, Galphin was retained on the eve of trial and had to do his work at unusual speed to help with settlement talks. He did not have all the transactional data to work with and did not have the benefit of hearing credible testimony about its character before he reached his opinion. We therefore can find that Galphin is also a skilled appraiser, but reject his

**[\*29]** opinion because it reflected an understandable lack of consideration of the property's recent, reliable, and therefore relevant transaction history.[17]

III.    Concluding Thoughts

The Kumars and Sapps aren't asking us to value the property higher than what they claimed on their tax returns.  They just want us to find that there were no deficiencies, so we need not even determine the exact value of the conservation easement.  We just need to determine whether they valued the conservation easement so high as to create deficiencies.  And we do not--there is no deficiency here for either taxpayer.  Looking at the transactional history of the specific property in question as well as the county property records, we find it more likely than not that the conservation easement was worth *at least* what SS Mountain (and therefore Kumar and Sapp) claimed on their tax returns.[18]

---

[17] The Kumars and Sapps suggest that, had Galphin applied a $750,000 lot value to his income analysis, it would have led to a value for the easement that exceeded $11,960,000.

[18] While this rapid increase in value is unusual, it is not unprecedented.  It has been well documented that land booms have happened over the course of American history, followed inevitably by their collapse.  See generally Edward L. Glaeser, "A Nation of Gamblers:  Real Estate Speculation and American History," Am. Econ. Rev., May 2013, at 1.  Between 1790 and 1796, the value of government-owned landed on the American frontier increased more than six times.  See id. at 10.  In Alabama, land that sold for only $35 per acre in 1817 began selling for $134 per acre the next year (a 270% increase).  Id. at 11.  And then

(continued...)

[*30] This is an exceptionally unusual conclusion to reach in a conservation-easement case. The Kumars and Sapps benefit from timing their donation at what turned out to be very nearly the frothiest point on a local real-estate bubble that was even bubblier than it was in most parts of the nation. In valuing that donation, they get the benefit of the bubble even as the Commissioner would get the benefit of its bursting a couple years later. We recall the old aphorism among observers of the stock market that "bulls make money, bears make money, but pigs get slaughtered." Kumar and Sapp here took a return position that was very considerably subhyperporcine--they get to keep their deductions in full and owe no penalty.

Decisions will be entered

for petitioners.

---

[18](...continued)
prices plummeted to their preboom levels the year after that. Id. In Chicago, prices rocketed from $800 per acre in 1830 (adjusted to 2012 dollars) to $327,000 in 1836, and then sank back down to $38,000 per acre in 1841. Id. at 17. Similar booms occurred in Los Angeles in the late 1800s, see id. at 21-23, and again in New York and Chicago at the turn of the century, see id. at 23-28. In the Florida land boom of the 1920s, real estate increased five times over one four-year period, and then crashed back to preboom levels. See, e.g., Henry M. Brown & Rebecca E. Brown, "Murphy Deed Right-Of-Way Reservations: A 1930s Taxpayer Bailout Yields Right-Of-Way Cost Savings," 83 Fla. Bar J. 20, 21-22 (2009). So while this rapid an increase in price may seem strange, it has happened before.